C. RICHARD COLLINS and FLOYD COLLINS, d/b/a COLLINS BROTHERS OIL COMPANY, a Partnership, Appellants v. PUBLIC SERVICE COMMISSION OF MISSOURI, Respondent, LACLEDE GAS COMPANY, Co-Respondent, No. 45179—293 S. W. (2d) 345.

Court en Banc, July 9, 1956.

Rehearing Denied, September 10, 1956.

*J. J. Middleton, Craig & Craig, Howard W. Campbell, Fordyce, Mayne, Hartman, Renard & Stribling, Nelson W. Hartman, Joseph R. Long* and *John P. Baird, Jr.,* for C. Richard Collins and Floyd Collins, d/b/a Collins Bros. Oil Co., appellants.

*Glenn D. Evans,* General Counsel, and *Frank J. Iuen,* Assistant General Counsel, for respondent Public Service Commission; *Thompson, Mitchell, Thompson & Douglas, Guy A. Thompson, James M. Douglas* and *Richard L. Eckhart* for co-respondent Laclede Gas Company.

[346] WESTHUES, J.—On August 29, 1953, the Laclede Gas Company of St. Louis, Missouri, filed application with the Public Service Commission seeking authority to exercise the power of eminent domain, as provided for in Sections 1-10A, Laws 1953, pp. 513-517 (Sections 393.410-393.510, RSMo 1949, V.A.M.S.), to acquire subsurface rock formations underlying 6,000 acres of land in St. Louis County and in St. Charles County, Missouri, for the purpose of storing gas therein for distribution and sale. On February 2, 1954, an amended application was filed. A number of intervening petitions were filed in objection to the application. One of these was filed by C. Richard Collins and Floyd Collins, doing business as Collins Brothers Oil Company, a partnership. Their application for intervention was allowed. Other such petitions were also sustained and an extensive hearing was had before the Public Service Commission. The Commission granted the application of the Laclede Gas Company. Collins Brothers Oil Company instituted review proceedings in the Circuit Court of Cole County. That court affirmed the order of the Commission and Collins Brothers Oil Company appealed to this court.

Collins Brothers alleged they held valuable oil and other mineral rights under lands affected by the proposed gas storage; that they had commercially producing oil wells thereon. That was the ground upon which they were allowed to intervene.

In the course of the opinion we shall refer to Collins Brothers Oil Company as appellants, to the Laclede Gas Company as Laclede, and to the Public Service Commission as the Commission.

Appellants briefed four questions seeking a reversal of the judgment of the Cole County Circuit Court affirming the order of the Commission. They are as follows (omitting citations of authorities):

"I. The Commission's order that it is in the public interest for Laclede to exercise condemnation is contrary to the law and the evidence, and this Court may review the evidence unhampered by the findings of fact by the Commission, and, thereupon may enter a lawful order on the Record.

"II. The Storage Act delegates to the Commission its power to determine when eminent domain shall be exercised without fixing any standard or criteria to guide the action of the Commission, and the *aid* (Act) therefore is unconstitutional as an unlawful delegation of legislative powers.

"III. The Storage Act authorizes the taking of property for private use and without compensation.

"IV. The classification of property subject to condemnation under the Storage Act is unjust, the selection of persons by the Commission who may exercise condemnation is arbitrary, and the Act is unconstitutional under the State and Federal Constitutions as discriminatory, denying equal privileges and immunities due process of law."

We shall dispose of these points in the order stated.

Laclede is a public utility subject to the regulation of the Commission. Its business is selling gas to the public in the City of St. Louis and in St. Louis County, Missouri. At the time of the hearing before the Commission, Laclede was selling about 90% of the fuel for cooking and 37% of the fuel for heating homes. There were on file with Laclede about 25,000 applications of home [347] owners desiring gas for heating their homes. The gas supply to Laclede was limited and therefore the Commission had by order curtailed Laclede's sales of gas for heating homes. Laclede was forced to refuse service to many applicants. Desiring to furnish its product to all applicants, Laclede sought ways and means to obtain a larger supply of gas for this purpose. It investigated the laying of additional pipe lines to points where gas was available. It was found that the cost of installation was exorbitant. The Mississippi River Fuel Corporation supplied the natural gas used by Laclede. The amount, however, was limited to 300,000,000 cubic feet per day. This was more than needed during the summer months. However, during the winter months, especially in zero weather, the peak load was so great it was insufficient to supply the demand. Laclede studied various methods in attempting to meet the demand for more gas. These investigations disclosed that storing the surplus gas not needed during the summer months and drawing on that supply in the winter was a method of meeting the situation.

Dr. Edward L. Clark, the Missouri State Geologist, was consulted. Then Max and Douglas Ball, and Carl A. Bays and Associates, oil and gas consultants, were employed to conduct explorations and determine the feasibility of storing gas underground in the St. Louis area.

These men, Dr. Clark, Max Ball, Douglas Ball, and Carl A. Bays, all experts in the matter of storage of gas underground, testified for applicant-Laclede at the hearing before the Commission. From their evidence, we learn that underneath an area of about 6,000 acres in the northern portion of St. Louis County and in a small portion in St. Charles County gas may be safely stored about 1200 feet or more below the surface of the land and the Missouri River. It is referred to as the "Lange area"—so named because the first test drill was made on land belonging to a man named Lange. A sandstone stratum referred to as the St. Peter formation is located about 1100 to 1400 feet below the surface. It has an anticline or saddleback position or formation thereby creating a dome or trap. The St. Peter formation

is overlaid by three strata impermeable to gas. They are, as stated by witness Carl A. Bays: "The St. Peter reservoir is overlain by three formations, the Joachim, Plattin, and Decorah, all of which are impermeable to gas, having been impermeable to chemical mingling of waters and significant pressure differences for long periods of geologic time. The strata form multiple sealing beds with much more than adequate caprock for the reservoir." Above the Decorah lies the Kimmswick formation from which appellants are obtaining oil. All of these strata are more than 500 feet below the surface and do not contain any of the products enumerated in Section 393.460 of the Gas Storage Act, supra. These witnesses testified that approximately 29 billion cubic feet of gas may be stored in this St. Peter dome formation. The method to be used is to pump gas into the St. Peter sandrock displacing the water or forcing it back. The three strata lying above the St. Peter, as above-mentioned, will hold the gas in the dome from whence it may be released through pipes when needed. Note the evidence of Douglas Ball as to the requirements for safe storage of gas:. "Three chief things are required for a safe and successful storage field: first, a reservoir bed, usually sandstone or limestone, porous enough and thick enough to contain an appreciable percentage of fluids per unit volume of itself, and permeable enough that fluids can move readily through it; second, a cap rock or sealing bed, such as clay shale, overlying the reservoir, impermeable enough and continuous enough that fluids cannot move through it to escape from the reservoir; third, a trap, a structure or condition of the rocks that confines a gas accumulation to a relatively small lateral area of the [348] reservoir. The traps easiest to find and most commonly known are closed anticlines, rocks folded to form domes.

"Natural gas fields have all these requisites and in addition have a nature given supply of gas in the reservoir. Where the natural fluid is water, the reservoir is known as an aquifer. Man stores gas in an aquifer by drilling into the reservoir at the top of a structure and displacing some of the water with the stored gas simply by pumping the gas in against the water's pressure."

The cost of the original exploration was at the time of the hearing about $800,000.

The first hearing was held before the Commission on March 19, 1954. The intervenors requested that they be given time to study the evidence of the witnesses and asked for a postponement of the hearings to a future date at which time they desired to cross-examine each witness. The request was granted and the date for further hearing was set for April 19. The several intervenors through their counsel at that time cross-examined each witness at length as to every material matter and many immaterial matters on the issues involved. Carl A. Bays, Douglas Ball, and Max Ball were cross-examined about the Herscher storage field located in northern Illinois

and used for gas storage to supply Chicago with gas. They, as well as Dr. Clark, were cross-examined in detail about every phase of the proposed storage in the St. Peter sandstone. It is our opinion that these cross-examinations strengthened rather than weakened Laclede's contention that gas may be stored profitably and safely in the Lange area. Appellants introduced evidence showing that at the Herscher storage field, gas had been leaking and coming to the surface ever since it had been used; that water supplies had been contaminated; that the gas company, owner of the storage, had supplied farmers and also the village of Herscher with water. Appellants also introduced evidence by an expert, a Mr. Mylius, that in all probability the Lange dome would leak. The expert witnesses for Laclede testified that the Lange area contained a better dome for gas storage than the Herscher field; that the overlying stratum, specifically the Joachim, which lies immediately above the St. Peter rock was impermeable to gas. These witnesses further testified that the Herscher storage, even with the leaks, was not unsuccessful.

Appellants in their reply brief stated that ''There is no rule of law which permits any Court, much less a Commission which is an administrative body, to categorically accept as true the testimony of witnesses for a Plaintiff or to consider their testimony alone as creditable. To the contrary, the testimony of such witnesses for the Plaintiff who must sustain the burden of proof, should be scrutinized most carefully in determining the weight of the evidence.''

██ We agree that the evidence of witnesses for a plaintiff should not be categorically accepted as true. There are certain rules governing the credit to be given to any witness whether he is a witness for plaintiff or for any other party interested in a controversy. The Commission, in its opinion filed with the order disposing of the case, considered at length the evidence of the witnesses for Laclede and the evidence offered by appellants. In passing on the credibility of the evidence and the weight to be given thereto, the Commission commented as follows with reference to the expert witnesses: ''On the one hand we have the opinions of consultants and geologists who have directed and supervised the exploratory drilling and have made studies of drilling samples, cores, water pressures, insoluble residues and have observed, considered and studied outcrops, earthquake history and driller's logs, electric logs and every source of information known to science. Each gives it as his positive and unqualified opinion that the proposed reservoir has all of the three prerequisites of an adequate, [349] feasible and safe reservoir bed for the storage of gas and that natural gas stored in such reservoir bed will not leak or escape therefrom.

''On the other hand, and for the interveners, we had Mr. Mylius, Mr. Firebaugh and Mr. McCole, none of whom had the opportunity to examine or study the drilling samples, cores, water pressures, in-

soluble residues or any other products of such exploratory wells, or observed driller's logs, electric logs or other subjective drilling operations in this area. Mr. Mylius and Mr. Firebaugh each gave it as their opinion that this storage reservoir will 'probably leak,' but declined to give it as their positive opinion that it will leak. Mr. McCole supplied that by giving it as his opinion that the storage reservoir will leak.''

The opportunity of a witness to observe and to acquire knowledge of the facts given in evidence should always be taken into consideration in weighing the evidence. 70 C.J. 766-769, Sec. 929, notes 35, 36, and 37, and cases there cited.

■ Appellants introduced evidence that there is in fact no shortage in fuel in the area; that there is a sufficient amount of coal and oil available to heat all the homes in the trade territory served by Laclede. The Commission took those facts into consideration. Of course, there is a difference of opinion as to what fuel is most desirable for heating. The evidence in this case showed beyond a doubt that thousands of persons desire gas wherewith to heat their homes and it cannot be supplied. Laclede, being a public utility, should make an effort to supply that demand. It has done so. Under the statutory law enacted by the legislature of 1953, referred to supra, Laclede could by private contract purchase underground storage space for the storage of gas and in that way supply its customers. If such space cannot be had without condemnation, then the law requires that permission must be obtained from the Commission. The sole issue to be determined by the Commission in such a case is whether it would be in the public interest to grant the right of condemnation. Section 393.440, supra. The Commission, after an exhaustive hearing pro and con, determined that Laclede should be granted the right of condemnation to acquire underground storage space in the Lange area; that such right will be in the public interest; that all of the prerequisites prescribed by the underground storage of gas act have been fulfilled. On the subject of ''What is a Public Use'' see 29 C.J.S. 823-828, Sec. 31, and cases cited under note 36; also see Bowman v. Kansas City, 361 Mo. 14, 233 S.W.(2d) 26, l.c. 32, 33 (11).

Appellants say in their brief that '' 'Public interest' is not synonymous with either 'public use' or 'public necessity.' It is something less than 'public necessity' and 'public use.' '' Appellant cited 29 C.J.S. 823 as authority for that statement. We cited that same authority supra. A reading of Section 31 of 29 C.J.S. will disclose that what is there said does not help appellants. See also 29 C.J.S. 845, Sec. 57. Whatever term appellants desire to apply, we think that the facts of this case justify a finding that the object sought to be attained by Laclede comes within the term ''public interest.'' We therefore rule that the finding of the Commission was correct in its

order granting to Laclede the right to condemn land within the Lange area "in the public interest." That was the only question before the Commission.

We do not think it necessary to discuss at length the question presented by point II in appellants' brief. Point II, as set forth above, does not present any particular question for discussion. We therefore examined appellants' argument to determine what they desired to present. Therein appellants quoted the following from 18 Am. Jur. 663, Sec. 36: "It is to be observed that the courts distinguish between a use which is [350] public and an interest which is public. Where there is simply a public interest, as distinguished from a public use, the power of eminent domain cannot be exercised." We believe that appellants have misconceived the nature of the proceeding before the Commission. The sole question before the Commission was whether it would be in the public interest to grant Laclede the right to acquire underground storage space in the Lange area by condemnation. That was simply a question of fact to be determined from the evidence presented to the Commission. It is all that is required by Section 393.440 of the Act, supra. Section 393.430 of the Act reads in part as follows: "Any gas storage company desiring to acquire by condemnation land or any interest therein or a temporary license pursuant to this section, *may to that end proceed as provided by, and subject to the provisions of chapter 523, RSMo, the provisions of which chapter are hereby made applicable in such case,* but subject, further, to the limitations and provisions provided in sections 393.410 to 393.510." (Emphasis ours)

Section 523.010, RSMo 1949, V.A.M.S., authorizes condemnation proceedings for the taking of property "for public use." The Gas Storage Act of 1953 placed a further limitation on the right of condemnation by requiring a gas company, such as Laclede, to obtain permission from the Commission before instituting condemnation. See also Art. I, Sec. 26, Constitution of Missouri, 1945. Whether the taking of property is for a public use or not is a judicial question which was not determined by the Commission. Appellants' contention that the term "in the public interest" was not defined and therefore no standard to guide the Commission was fixed by the legislature must be denied. We ruled on that question in State ex rel. Consumers Public Service Co. v. Public Service Commission, 352 Mo. 905, 180 S.W. (2d) 40, l.c. 48 (11, 12). See also National Broadcasting Co. v. United States, 319 U.S. 190, 87 L.Ed. 1344, l.c. 1367, 1368; New York Central Securities Corp. v. United States, 287 U.S. 12, 77 L.Ed. 138, l.c. 145, 146.

What we have heretofore said fully disposes of point III of appellants, wherein they say, "The Storage Act authorizes the taking of property for private use and without compensation." We desire to add a few comments, however. Appellants in the argument say,

"The language used in the Act is so broad that a proposed condemnor, having once received the stamp of approval from the Public Service Commission, under the guise of 'public interest' has authority which is paramount to the state government or any political subdivision thereof." Laclede, having obtained permission to institute condemnation proceedings from the Commission, is not free to go forward unhampered or unrestricted by the laws governing condemnation. As above-noted, the Storage Act expressly subjected such a proceeding to the provisions of Chapter 523, supra. Nothing in the Act even suggests the taking of property for private use and *without compensation*. On the contrary, the Act contemplates the taking of private property for public use for a price to be determined in a condemnation proceeding.

In point IV of appellants' brief, they say that the Storage Act is discriminatory and therefore unconstitutional. It is argued that "formations containing non-potable waters are allowed to be condemned while those containing potable waters are prohibited." The State Legislature may authorize condemnation of certain classified property and withhold from condemnation other property. See Kansas & T. Coal Ry. Co. v. Northwestern Coal & Mining Co., 161 Mo. 288, 61 S.W. 684. If the classifications are not arbitrary, no constitutional rights are violated. Ballantine v. Nester, 350 Mo. 58, 164 S.W. (2d) 378, l.c. 383 (16-18), and cases there cited. The classification made cannot be said to be arbitrary.

Our conclusion is that the Commission was justified in finding from the evidence [351] presented that it would be in the public interest to permit Laclede to acquire storage space to the end that it may better and more adequately serve the inhabitants of St. Louis and of the surrounding territory with fuel gas.

In the condemnation proceedings (if one is to be instituted), all rights of the property owners whose property is to be taken may be protected.

The judgment of the Circuit Court of Cole County approving the order of the Commission is hereby affirmed. All concur.